Monica S. Call (#11361)
monica.call@stoel.com
STOEL RIVES LLP
201 South Main Street, Suite 1100
Salt Lake City, UT 84111-4904
Telephone: (801) 328-3131
Facsimile: (801) 578-6999

Daren S. Garcia (*pro hac*)
dsgarcia@vorys.com
Rodney A. Holaday (*pro hac*)
raholaday@vorys.com
William D. Kloss, Jr. (*pro hac*)
wdklossjr@vorys.com
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, OH 43215
Telephone: (614) 464-8356
Facsimile: (614) 719-5112

*Attorneys for Skullcandy, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SKULLCANDY, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>FILTER USA INC., a New York corporation, BENJAMIN FRIEDLANDER, an individual, both doing business as "Filter Pro" on www.amazon.com, and JOHN DOES 1-10,<br><br>Defendants. | **PLAINTIFF SKULLCANDY'S MEMORANDUM IN OPPOSITION TO DEFENDANTS FILTER USA, INC. AND BENJAMIN FRIEDLANDER'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM PURSUANT TO FED R. CIV. P. 12(b)(6)**<br><br>Case No: 2:18-cv-00748-DAK<br><br>District Judge: Dale A. Kimball |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES .................................................................................................iii

I.     INTRODUCTION ...................................................................................................... 1

II.    STATEMENT OF RELEVANT FACTS ................................................................... 2

       A.     Skullcandy Products and Trademarks.............................................................. 2

       B.     Online Marketplaces and the Well-Recognized Threats They Present to
              Skullcandy's Goodwill and Product Quality .................................................. 2

       C.     Skullcandy Has Implemented Substantial Quality Controls and Restricted
              the Sales of Its Products on Online Marketplaces to Protect Its Goodwill
              and the Value of the Skullcandy Trademarks ................................................. 4

       D.     Skullcandy's Warranty Is Expressly Limited to Products That Are Subject
              to Its Quality Controls.................................................................................... 6

       E.     Defendants Are Unauthorized Sellers of Non-Genuine Skullcandy Products
              Operating Outside of and Intentionally Interfering with Skullcandy's
              Quality Controls............................................................................................. 7

       F.     Defendants Are Selling Products That Do Not Come with Skullcandy's
              Warranty Because Defendants Are Outside of and Do Not Follow
              Skullcandy's Quality Controls ....................................................................... 9

III.   LAW AND ARGUMENT ........................................................................................ 10

       A.     Defendants' Motion Must Be Denied Because Skullcandy Has Sufficiently
              Pleaded Two Independent Exceptions to the First Sale Doctrine ..................... 10

              1.     The "Quality Control" Exception to the First Sale Doctrine ................... 12

                     a.     Skullcandy Has Sufficiently Pleaded the Applicability of the
                            Quality Control Exception Because: (i) It Has Legitimate,
                            Substantial, and Non-Pretextual Quality Control Procedures;
                            (ii) It Abides by Its Procedures, and (iii) Defendants' Sales of
                            Products Outside Skullcandy's Quality Controls Harm the
                            Value of Its Trademarks ............................................................... 14

                     b.     Defendants' Authorities Are Substantively and Procedurally
                            Inapposite ..................................................................................... 16

2.    Defendants' Products Are Materially Different Because They Are
Not Covered by Skullcandy's Warranty ................................................... 21

IV.    CONCLUSION ........................................................................................................ 25

CERTIFICATE OF SERVICE ........................................................................................... 27

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ........................................................ 20

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 603 F.3d 1133 (9th Cir. 2010) .................. 11

*Bel Canto Design, Ltd. v. MSS HiFi, Inc.*, 837 F. Supp. 2d 208 (S.D.N.Y. 2011) ............... passim

*Bel Canto Design, Ltd. v. MSS HiFi, Inc.*, No. 11 Civ. 6353 (CM), 2012 U.S. Dist.
LEXIS 86628 (S.D.N.Y. June 20, 2012) .............................................................. 2, 25

*Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067 (10th Cir.
2009) ........................................................................................ 10, 21, 22

*Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119 (10th Cir. 1994) .................................................... 25

*Brilliance Audio, Inc. v. Haights Cross Communs., Inc.*, 474 F.3d 365 (6th Cir. 2007).......... 21, 22

*Caterpillar, Inc. v. Nationwide Equipment*, 877 F. Supp. 611 (M.D. Fla. 1994) ........................ 12

*Christison v. Biogen Idec, Inc.*, No. 2:11-cv-01140, 2014 U.S. Dist. LEXIS 175050
(D. Utah Dec. 18, 2014) ............................................................................... 14

*Davidoff & Cie., S.A. v. PLD Int'l Corp.*, 263 F.3d 1297 (11th Cir. 2001) ....................... 10, 11, 21

*Desmond v. Chi. Boxed Beef Distribs.*, 921 F. Supp. 2d 872 (N.D. Ill. 2013) ...................... 12, 14

*El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 393 (2d Cir. 1986).................... 12, 14

*Ford Motor Co. v. Heritage Mgmt. Group, Inc.*, 911 F. Supp. 2d 616 (E.D. Tenn.
2012) ............................................................................................... 12

*FURminator, Inc. v. Kirk Weaver Enters, Inc.*, 545 F. Supp. 2d 685 (N.D. Ohio
2008) ............................................................................................... 12

*General Motors Co. v. Urban Gorilla, LLC*, No. 2:06-CV-00133 BSJ, 2010 U.S.
Dist. LEXIS 136711 (D. Utah Dec. 27, 2010)........................................................... 11

*Gracenote, Inc. v. Sorenson Media, Inc.*, No. 2:16-cv-950, 2017 U.S. Dist. LEXIS
73954 (D. Utah May 15, 2017)......................................................................... 20

*Hand & Nail Harmony, Inc. v. Int'l Nail Co.*, No. CV 15-0218 SJO, 2015 U.S.
Dist. LEXIS 67421 (C.D. Cal. May 22, 2015) .......................................................... 12

*Iberia Foods Corp. v. Romeo*, 150 F.3d 298 (3d Cir. 1998)..................................................... 18, 19

*Kimray, Inc. v. Norriseal-Wellmark, Inc.*, 2017 U.S. Dist. LEXIS 69738 (W.D. Okla. May 8, 2017) ......................................................................................................... 20

*Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377 (6th Cir. 2006) .......................................................................................................................... 13

*Majewski v. Broadalbin-Perth Cent. Sch. Dist.*, 91 N.Y.2d 577 (1998)........................................ 23

*Marion Energy, Inc. v. KFJ Ranch P'ship*, 267 P.3d 863 (Utah 2011) ......................................... 23

*Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839 (N.D. Tex. 2009) ................................................ 12

*Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587 (5th Cir. 1993) ............ 17, 18

*Novell, Inc. v. Network Trade Ctr.*, 25 F. Supp. 2d 1218 (D. Utah 1997) .................................... 10

*S&L Vitamins, Inc. v. Australian Gold, Inc.*, 521 F. Supp. 2d 188 (E.D.N.Y. 2007)....... 11, 17, 18

*Scott v. Provo City*, No. 2:15-cv-00661, 2016 U.S. Dist. LEXIS 107204 (D. Utah June 17, 2016).............................................................................................................. 3

*Sheldon v. Vermonty*, 269 F.3d 1202 (10th Cir. 2001) ............................................................... 25

*Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104 (4th Cir. 1991) .............................. 13

*Societe Des Produits Nestle, S.A. v. Case Helvetica, Inc.*, 982 F.2d 633 (1st Cir. 1992) ...................................................................................................................... 14, 21

*Std. Process, Inc. v. Banks*, 554 F. Supp. 2d 866 (E.D. Wis. 2008) ...................................... 17, 18

*Tacori Enters. v. Michael Joaillier, Inc.*, 207 F. Supp. 3d 799 (S.D. Ohio 2016)....................... 22

*Tal v. Hogan*, 453 F.3d 1244 (10th Cir. 2006) .............................................................................. 3

*Technomarine SA v. Jacob Time, Inc.*, 905 F. Supp. 2d 482 (S.D.N.Y. 2012)............................. 16

*TracFone Wireless, Inc. v. Pak China Group Co.*, 843 F. Supp. 2d 1284 (S.D. Fla. 2012) .......................................................................................................................... 22

*Turner v. Staker & Parson Cos.*, 284 P.3d 600 (Utah 2012) ....................................................... 23

*Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045 (10th Cir. 2008).................................................................................................... 10

*Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3 (2d Cir. 1996).................................... 12

*Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238 (2d Cir. 2009)........................................... 11, 12, 13

**Statutes**

15 U.S.C. § 1114(1)(a)........................................................................................................ 10

15 U.S.C. § 1125(c) ........................................................................................................... 11

**Rules**

Rule 12(b)(6).................................................................................................................... 22

**Other Authorities**

Amazon.com, Inc. Community Guidelines, available at https://www.amazon.com/
gp/help/customer/ display.html?nodeId=201929730.................................................. 4

Amazon.com, Inc., Annual Report (Form 10-K), at 14 (Jan. 31, 2019), *available at*
https://www.sec.gov/Archives/edgar/data/1018724/000101872419000004/amzn2
0181231x10k.htm .......................................................................................................... 3

N.Y. Gen. Bus. Law § 369-b .................................................................................... passim

## I.    INTRODUCTION

This Court should deny Defendants' Motion to Dismiss Plaintiff Skullcandy, Inc.'s ("Skullcandy") complaint. Skullcandy has pleaded viable claims for trademark infringement and unfair competition under the Lanham Act grounded in two well-recognized exceptions to the first sale doctrine. First, Skullcandy has sufficiently pleaded that Defendants fail to adhere to Skullcandy's legitimate, substantial and non pretextual quality controls. Skullcandy's allegations, which must be accepted as true, establish that Defendants are not subject to these important controls and that Defendants are interfering with Skullcandy's efforts to ensure that customers receive the high quality Skullcandy products they expect. Defendants' contrary arguments rest on: (i) disputed facts, (ii) material omissions of the allegations in the complaint, and (iii) cases that are both factually inapposite and procedurally divorced from Defendants' motion. Indeed, most of the cases relied upon by Defendants were issued at summary judgment and involved a fact intensive review of the evidence developed in discovery.

Second, Skullcandy has adequately pleaded that Defendants' products are "materially different" from genuine Skullcandy products because they do not come with the Skullcandy warranty. A difference in warranty coverage is a long-recognized material difference capable of supporting a claim of trademark infringement. Defendants' motion asserts that this undisputed difference in warranty coverage is not an actionable material difference in light of N.Y. Gen. Bus. Law § 369-b. Under the plain language of the statute, however, § 369-b does not apply where, as here, Skullcandy's denial of warranty coverage is not based "***solely***" on whether the merchandise is sold by an authorized dealer. *See Bel Canto Design, Ltd. v. MSS HiFi, Inc.*, 837 F. Supp. 2d 208, 228-229 (S.D.N.Y. 2011). Here the warranty limitation about which Defendants complain is not

based "solely" on whether products were sold by a "particular dealer." Instead, Skullcandy's warranty expressly states that it does not extend to products sold by sellers that are not subject to and do not follow its quality controls. Furthermore, **the single court that has interpreted § 369-b in this context held that whether a manufacturer has "other reasons for refusing to honor any warranty"—which would render § 369-b "immaterial"—is "not an issue we can resolve on a motion to dismiss**." *Bel Canto Design, Ltd. v. MSS HiFi, Inc.*, No. 11 Civ. 6353 (CM), 2012 U.S. Dist. LEXIS 86628, at *45-46 (S.D.N.Y. June 20, 2012). Accordingly, this Court should rule that all of Skullcandy's claims will proceed to fact discovery.

## II.   STATEMENT OF RELEVANT FACTS

### A.   Skullcandy Products and Trademarks

Skullcandy develops, manufactures, markets, and sells headphones and speakers, protected by numerous registered trademarks. (Doc. 2, Compl. at ¶¶ 8, 10.) Skullcandy actively uses, advertises, and markets the Skullcandy Trademarks in commerce throughout the United States, which are widely associated with high quality products. (*Id.* at ¶¶ 15-16, 19.)

### B.   Online Marketplaces and the Well-Recognized Threats They Present to Skullcandy's Goodwill and Product Quality

E-commerce sales have exploded over the past decade, particularly on online marketplaces like Amazon where anyone can sell virtually any product with zero oversight from the manufacturer in terms of product quality. (*Id.* at ¶¶ 21-22.) Consumers purchasing on Amazon cannot inspect products prior to purchase; they must simply hope products will arrive in the condition they expect from the manufacturer. (*Id.* at ¶ 24.) In addition, online marketplace sellers like Defendants typically sell products anonymously. (*Id.* at ¶ 25.) The result is that most Amazon consumers do not know whom they purchased a product from, and often incorrectly believe they

purchased from the manufacturer when they actually purchased from an unauthorized seller. (*Id.* at ¶¶ 25, 30.) This is exacerbated by the fact that on Amazon all sellers purporting to offer a particular product are grouped under a single listing, obfuscating whether the product offering originates from the manufacturer, a known third party seller subject to the manufacturer's quality controls, or a rogue unauthorized seller. (*Id.* at ¶¶ 28-29.) The resulting ecosystem presents unique product quality challenges not previously encountered in the retail world, which greatly challenge a manufacturer's ability to control the quality and safety of its products. (*Id.* at ¶ 23.)

The unfortunate reality is that unauthorized sellers exploit this ecosystem by selling products that are fake, damaged, returned, or of otherwise poor quality to unwitting consumers. (*Id.* at ¶ 26.) In fact, Amazon itself recently informed investors that third parties are selling products on its platform that are "materially different" from products that consumers expect to receive, and that these actions are "violating the proprietary rights of others." *See* Amazon.com, Inc., Annual Report (Form 10-K), at 14 (Jan. 31, 2019), *available at* https://www.sec.gov/Archives/ edgar/data/1018724/000101872419000004/amzn20181231x10k.htm.[1]

Obviously, when unsuspecting consumers receive poor quality products a manufacturer's goodwill, reputation, and brand integrity is harmed. (*Id.* at ¶ 28.) This harm is magnified by the fact that online marketplaces provide consumers a powerful and wide-reaching forum to air their grievances – product reviews. (*Id.* at ¶ 31.) Any dissatisfied consumer can post a negative review for the entire world to see, which can remain visible and reduce an aggregate product "rating" in

---

[1] On a motion to dismiss, this Court may take judicial notice of facts that are a matter of public record without converting the motion into one for summary judgment. *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006); *Scott v. Provo City*, No. 2:15-cv-00661, 2016 U.S. Dist. LEXIS 107204, *5 (D. Utah June 17, 2016).

perpetuity. (*Id.*) Because of the confusion created by sellers' anonymity, angry consumers often complain about the **brand itself** in negative reviews rather than the seller that sold the poor quality product. (*Id.* at ¶¶ 30-31.)[2]

The unauthorized sale of poor quality (including broken, used, counterfeit or otherwise defective) Skullcandy products on Amazon has caused consumers to write numerous negative reviews that harm Skullcandy's goodwill and reputation. (*Id.* at ¶¶ 36-41.)

### C.   Skullcandy Has Implemented Substantial Quality Controls and Restricted the Sales of Its Products on Online Marketplaces to Protect Its Goodwill and the Value of the Skullcandy Trademarks

Faced with the threats to its brand and consumer goodwill posed by these entirely new market dynamics, Skullcandy implemented a robust quality control program across all of its authorized channels of distribution. (Doc. 2, Compl. at ¶ 44.)  The purposes of the program are to: (1) ensure that consumers receive Skullcandy products that feature all of the special characteristics and quality safeguards that they expect from Skullcandy; (2) minimize the likelihood that consumers receive poor quality products; and (3) make certain that Skullcandy and consumers always know the identities of online sellers that are selling Skullcandy products so any quality issues can be promptly addressed and resolved. (*Id.* at ¶¶ 45-46, 55.)

As an initial step, Skullcandy exercises control over the distribution of its products by allowing Skullcandy products to be sold only: (1) by itself, directly to consumers through its

---

[2] Marketplaces often have rules for reviews that prevent consumers from identifying and blaming specific sellers of products even when they believe that an unauthorized seller (rather than the manufacturer) is responsible for a poor consumer experience. For example, Amazon prohibits consumers from identifying specific sellers in product reviews. *See* Amazon.com, Inc. Community Guidelines, *available at* https://www.amazon.com/gp/help/customer/ display.html?nodeId= 201929730. This practice exacerbates the harm that is caused to manufacturers' reputations by the sale of poor quality products by unauthorized sellers.

website, and (2) by Authorized Distributors and Authorized Retailers (collectively, "Authorized Dealers"). (*Id.* at ¶¶ 8, 49-50.) Authorized Distributors are permitted to sell Skullcandy products only to Authorized Retailers, and Authorized Retailers are permitted to sell products only to end user customers. (*Id.* at ¶¶ 51-52.) By strictly controlling the distribution of its products and exercising quality controls throughout its authorized channels of distribution, Skullcandy has taken measures to ensure that products purchased from Authorized Dealers are subject to Skullcandy's quality controls. (*Id.* at ¶¶ 49-50, 56.)

Despite Defendants' material omissions and bald assertions to the contrary, Skullcandy's quality controls are legitimate, substantial and non-pretextual, particularly given the quality perils associated with the e-commerce and online marketplace channel. (*Id.* at ¶ 64.) Skullcandy requires Authorized Dealers to follow quality controls and other requirements governing their sales of Skullcandy products, including:

- Inspecting products for any damage or defects, refraining from selling such products, and reporting any defects to Skullcandy so that Skullcandy can adequately address the issue. These requirements ensure that consumers receive the genuine, high quality products they expect from Skullcandy. (*Id.* at ¶ 57.)

- Storing products in a cool, dry place, away from direct sunlight, extreme heat, and dampness, and in accordance with other applicable laws, rules, regulations, and other storage guidelines specified by Skullcandy. (*Id.* at ¶ 58.)

- Selling Skullcandy products in their original packaging and not: (1) relabeling, repackaging, or altering Skullcandy products; or (2) removing, translating, or modifying the contents of any label or literature on or accompanying Skullcandy products. (*Id.* at ¶ 59.)

- Assisting with product recalls and other consumer safety information efforts and agreeing to not tamper with, deface, or otherwise alter any serial number or other identifying information on Skullcandy products. To allow it to detect counterfeit products, Skullcandy places serial numbers on many of its products. Skullcandy also uses these numbers to keep track of which specific products have been sold to specific

5

Authorized Dealers, which allows it to take corrective action if a customer complains of poor product quality and provides a serial number. (*Id.* at ¶ 60.)

- Familiarizing themselves with the features of all Skullcandy products in their inventory so they can recommend the Skullcandy products that are best suited for end user consumers' needs and advise consumers on how to use Skullcandy products safely and properly. Authorized Retailers must also provide ongoing support to consumers after the time of sale and respond to all consumer inquiries. (*Id.* at ¶¶ 61-62.)

- Selling online only on private websites that: (1) are operated by the Authorized Dealer in the Dealer's legal name or registered fictitious name; (2) conspicuously state the Dealer's legal name, mailing address, telephone number, and email address; (3) do not use any third-party fulfillment service to store products or fulfill product orders, such that customers could receive products that did not come from the Authorized Dealer's inventory; and (4) only use images of Skullcandy products that were supplied by or authorized by Skullcandy and keep all product descriptions accurate and up to date. These requirements ensure, among other things, that Skullcandy always knows which of its Authorized Dealers are selling online and how to immediately contact them in the event of any product quality issues. (*Id.* at ¶¶ 53, 55.)

- Not sell Skullcandy products on any third party marketplace, including Amazon, unless they receive Skullcandy's prior written consent. (*Id.* at ¶ 54.)

If Skullcandy learns that an Authorized Dealer is selling in contravention of its quality controls, it has the ability to require that the Authorized Dealer disclose all relevant information concerning the products at issue and cooperate with Skullcandy as it investigates to determine the source of the problem. (*Id.* at ¶ 63.) Skullcandy has the right to cease selling its products to Authorized Dealers who refuse or otherwise fail to abide by these important principles, and terminate their status as Authorized Dealers. (*Id.*)

### D. Skullcandy's Warranty Is Expressly Limited to Products That Are Subject to Its Quality Controls

Skullcandy provides a two year limited warranty for all products sold to end user customers by Authorized Retailers (the "Warranty"). (Doc. 2, Compl. at ¶ 67.) The Warranty provides that, if at the time of purchase a product contained a manufacturing defect or had been damaged by

improper care prior to the time of purchase, Skullcandy will (i) repair, (ii) replace, or (iii) provide a Warranty Credit for the product for use in the Skullcandy online store. (*Id.*)

Because it has no ability to control and safeguard the quality of products sold outside of its authorized channels, Skullcandy extends the Warranty only to products that were sold by sellers that are subject to its quality controls and agree to abide by them. (*Id.* at ¶ 68.)

### E. Defendants Are Unauthorized Sellers of Non-Genuine Skullcandy Products Operating Outside of and Intentionally Interfering with Skullcandy's Quality Controls

Beginning in or before January 2018, Defendants have sold a high volume of Skullcandy products through an anonymous Amazon storefront called "Filter Pro." (Doc. 1 at ¶¶ 72, 74.) Defendants have never been Authorized Dealers of Skullcandy products, and are accordingly selling products outside of Skullcandy's quality controls. (*Id.* at ¶ 73.)

Skullcandy's complaint identifies numerous ways in which Defendants are failing to adhere to Skullcandy's quality controls, including:

- Defendants have not provided their business information or allowed Skullcandy to vet them to determine if they meet the high standards that Skullcandy demands of its Authorized Dealers. (*Id.* at ¶ 76.)

- Defendants sell products on Amazon anonymously and undertake great efforts to maintain anonymity and prevent anyone from contacting them. (*Id.* at ¶ 77.)

- Defendants do not inspect products for damage, defects, missing parts, tampering, or other non-conformance and do not remove products from their inventory. Instead, they sell products that are damaged or of otherwise poor quality. They also do not report any discovered product defects to Skullcandy. (*Id.* at ¶ 79.)

- Defendants do not store their products in accordance with the storage guidelines that Skullcandy requires Authorized Dealers to follow. (*Id.* at ¶ 80.)

- Defendants resell products as "new" that have been opened, returned, and/or repackaged. They also allow products that are returned to Amazon to be repackaged and placed back in their inventory as "new" products, which causes consumers who

believe they are purchasing new Skullcandy products to actually receive returned products of inferior quality. (*Id.* at ¶ 82.)

- Defendants do not comply with Skullcandy's quality control requirements relating to the handling, packaging, and shipping of products, causing consumers to receive Skullcandy products that arrive damaged or defective. (*Id.* at ¶ 83.)

- Defendants allow their inventory to be commingled with other sellers' inventory, including counterfeit and damaged products, which causes consumers to sometimes receive products from other sellers' inventories when they purport to purchase Skullcandy products from Defendants. (*Id.* at ¶ 81.)

- Defendants are not qualified nor have they been trained to accurately describe and demonstrate how Skullcandy products work or advise consumers how to safely and properly use them. Defendants are also unable to provide the ongoing support and responses to consumer inquiries—including questions received after the time of sale— that Authorized Dealers are required to provide. (*Id.* at ¶¶ 86-87.)

- Defendants do not take any steps to address negative reviews received from customers about their sales of Skullcandy products and do not cooperate with Skullcandy in investigating negative product reviews. (*Id.* at ¶¶ 88.)

As unauthorized sellers, Defendants have no access to Skullcandy's quality control standards or even any line of communication with Skullcandy to, for example, report defective products or cooperate with Skullcandy in investigating and rectifying product quality issues. (*Id.* at ¶¶ 64, 84.) Defendants' lack of compliance is also evidenced by the numerous negative reviews in which consumers report receipt of poor quality Skullcandy products. (*Id.* at ¶¶ 35-41.)[3]

Worse yet, Defendants are also actively interfering with Skullcandy's quality controls in the following ways:

---

[3] Although these reviews do not identify the specific Amazon seller who sold the product that is the subject of the review—because Amazon does not *allow* product reviews to provide this information—it can reasonably be inferred that Defendants sold some of the products that generated the negative reviews from the facts that (1) Defendants have sold a high volume of Skullcandy products, and (2) Defendants are non-Authorized Dealers who are outside of Skullcandy's quality controls. (*Id.* at ¶ 43.)

- By selling products anonymously, Defendants are preventing Skullcandy from knowing where its products are sold on the internet and by whom, and from being able to address any quality issues it discovers in the Skullcandy products that Defendants are selling. Because of the Defendants' anonymity, consumers are also unable to effectively bring any quality issues they discover in Defendants' products to Skullcandy's attention because they do not know Defendants' identities or contact information. (*Id.* at ¶ 77.)

- Skullcandy is unable to conduct product recall with respect to products in Defendants' inventory or disseminate warnings about its products to consumers who purchase from Defendants, because Skullcandy does not have a record of the serial numbers on the products Defendants are selling or a means of communicating consumer safety information efforts to Defendants. (*Id.* at ¶ 85.)

- As non-Authorized Dealers, Skullcandy cannot audit Defendants to ensure that they are complying with Skullcandy's quality controls, learn the source(s) of Defendants' products to confirm that they are not selling counterfeit products or products that came from another unauthorized source, work with Defendants to investigate any negative reviews of products sold by Defendants, and close Defendants' account if they are failing to comply with Skullcandy's quality control program. (*Id.* at ¶¶ 63, 84, 88.)

For all of these reasons, the products Defendants are selling are not genuine Skullcandy products and their sales of non-genuine products are diminishing the value of the Skullcandy Trademarks. (*Id.* at ¶¶ 89-91, 108-112.)

### F. Defendants Are Selling Products That Do Not Come with Skullcandy's Warranty Because Defendants Are Outside of and Do Not Follow Skullcandy's Quality Controls

Because Defendants are not subject to Skullcandy's quality controls—and Skullcandy thus cannot ensure the quality of products sold by Defendants or take any corrective action regarding products sold by Defendants—the products Defendants sell are not covered by the Warranty. (*Id.* at ¶ 68.) The warranty is a material element of genuine Skullcandy products and an important consideration in a consumer's purchasing decision. (*Id.* at ¶ 69.) Accordingly, the products Defendants are selling are also materially different from genuine Skullcandy products. (*Id.* at ¶ 93.)

Defendants' unauthorized sales of non-genuine products bearing the Skullcandy Trademarks create a likelihood of consumer confusion because consumers who purchase from Defendants falsely believe they are receiving genuine Skullcandy products that are sold by Skullcandy or with Skullcandy's authorization, are covered by the Warranty, and are subject to and abide by Skullcandy's quality controls. (*Id.* at ¶¶ 94, 146-148.)

## III.   LAW AND ARGUMENT

### A.   Defendants' Motion Must Be Denied Because Skullcandy Has Sufficiently Pleaded Two Independent Exceptions to the First Sale Doctrine

To state a claim for trademark infringement, a plaintiff must allege that: (1) it owns a valid, protectable trademark; (2) the defendant used the trademark in commerce without the plaintiff's consent; and (3) the defendant's use of the trademark creates a likelihood of confusion. *See* 15 U.S.C. § 1114(1)(a); *Novell, Inc. v. Network Trade Ctr.*, 25 F. Supp. 2d 1218, 1225 (D. Utah 1997). A claim for unfair competition has "virtually identical elements" and also requires the plaintiff to show that the defendant's use of the plaintiff's trademark creates a likelihood of confusion. *See Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008); *Novell*, 25 F. Supp. 2d at 1227.

Although courts generally consider a group of factors in determining whether a defendant's use of a trademark created a likelihood of confusion, *see, e.g., Utah Lighthouse*, 527 F.3d at 1055, courts conduct a different analysis where, as here, a defendant is reselling products the plaintiff manufactured that bear the plaintiff's actual marks. In this circumstance, courts hold that the defendant's sales are likely to create confusion if the products it sells are: (1) "materially different" from products sold by the plaintiff, *see, e.g., Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1071-73 (10th Cir. 2009); *Davidoff & Cie., S.A. v. PLD Int'l Corp.*, 263 F.3d

1297, 1301 (11th Cir. 2001); or are (2) outside of the plaintiff's legitimate quality controls, do not adhere to the plaintiff's quality controls, or are being sold in a manner that prevents the plaintiff from being able to exercise its quality controls. *See, e.g., Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243-44 (2d Cir. 2009); *Bel Canto Design, Ltd. v. MSS HiFi, Inc.*, 837 F. Supp. 2d 208, 229-30 (S.D.N.Y. 2011). If **either** of these conditions is met, the products sold by the defendant are deemed "not genuine" and the defendant cannot invoke the affirmative defense commonly called the "first sale doctrine." *See Zino Davidoff*, 571 F.3d at 243; *Davidoff*, 263 F.3d at 1300 n.4, 1301-02.

Here, Defendants contend only that Skullcandy has failed to sufficiently plead the "likelihood of consumer confusion" element of its trademark infringement and unfair competition claims; Defendants do not challenge any of the other elements of Skullcandy's claims. (Doc. 13 at 3-16.)[4] Defendants also implicitly concede that their motion must be denied if Skullcandy has sufficiently pleaded either (1) the "material difference" *or* (2) the "quality control" exceptions to the first sale doctrine. (*Id.* at 4-5.) For the reasons discussed below, Skullcandy has plainly done so.

---

[4] Defendants have misstated the law in asserting that "all federal claims must be dismissed" if this Court concludes that Skullcandy has failed to adequately plead a likelihood of consumer confusion. (*Id.* at 5 n.1.) Unlike Skullcandy's other Lanham Act claims, Skullcandy's trademark dilution claim does ***not*** require a showing that Defendants' sales create a likelihood of confusion. *See* 15 U.S.C. § 1125(c) (owner of a famous mark has claim for trademark dilution if defendant's use "is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, ***regardless of the presence or absence of actual or likely confusion***…"); *see also, e.g., General Motors Co. v. Urban Gorilla, LLC*, No. 2:06-CV-00133 BSJ, 2010 U.S. Dist. LEXIS 136711, at *14 (D. Utah Dec. 27, 2010) (listing elements of trademark dilution, which do not include showing a likelihood of confusion); *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 603 F.3d 1133, 1136 (9th Cir. 2010) (applying first sale doctrine to trademark infringement claim and analyzing dilution claim without applying first sale doctrine); *S&L Vitamins, Inc. v. Australian Gold, Inc.*, 521 F. Supp. 2d 188, 202-05, 210-12 (E.D.N.Y. 2007) (same).

    Accordingly, Defendants have not challenged Skullcandy's claim for trademark dilution or presented any viable reason to dismiss Skullcandy's state and common law claims. (*See* Doc. 13 at 5 n.1 (arguing only that this Court will no longer have subject-matter jurisdiction over Skullcandy's state and common law claims if it dismisses all of Skullcandy's federal claims)).

### 1.    The "Quality Control" Exception to the First Sale Doctrine

In a seminal decision, *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3 (2d Cir. 1996), the Second Circuit held that a trademarked product is not "genuine"—and that any resale is not protected by the first sale doctrine—if the manufacturer has established quality controls and the product is at issue is not subject to those quality controls. This follows because "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." *Id.* at 6 (quoting *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 393, 395 (2d Cir. 1986)). The court held that a plaintiff mark owner has a claim for trademark infringement against a defendant that is reselling products bearing the plaintiff's mark if "(i) [the plaintiff] has established legitimate, substantial, and non-pretextual quality control procedures, (ii) [the plaintiff] abides by these procedures, and (iii) the non-conforming sales [by the defendant] will diminish the value of the mark." *Id.* at 6. The reasoning and holdings of *Warner-Lambert* and *El Greco* have been adopted by courts across the country.[5]

---

[5] *See, e.g.*, *Hand & Nail Harmony, Inc. v. Int'l Nail Co.*, No. CV 15-0218 SJO, 2015 U.S. Dist. LEXIS 67421, at *28-29 (C.D. Cal. May 22, 2015) (granting preliminary injunction based on *Warner-Lambert*); *Desmond v. Chi. Boxed Beef Distribs.*, 921 F. Supp. 2d 872, 881-83 (N.D. Ill. 2013) (denying motion to dismiss because of quality control doctrine in *Warner-Lambert* and *El-Greco*); *Ford Motor Co. v. Heritage Mgmt. Group, Inc.*, 911 F. Supp. 2d 616, 625-27 & n.2 (E.D. Tenn. 2012) (applying rules of *Warner-Lambert* and *El Greco* and noting that many district courts in the Sixth Circuit have done the same in cases involving "legitimately manufactured goods that have not been authorized for sale"); *Zino Davidoff*, 571 F.3d at 243-44 ("[G]oods are not genuine if they do not conform to the trademark holder's quality control standards"); *Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839, 853-54 (N.D. Tex. 2009) (finding *Warner-Lambert*'s test "persuasive" and applying it to deny summary judgment on first sale doctrine defense); *FURminator, Inc. v. Kirk Weaver Enters, Inc.*, 545 F. Supp. 2d 685, 689 (N.D. Ohio 2008) (following *El Greco* and explaining that "[a] trademark signifies that goods sold under it are of equal quality. A trademark holder is able to control the quality of the goods and a trademark acts as an indicator of consistent quality."); *Caterpillar, Inc. v. Nationwide Equipment*, 877 F. Supp.

Importantly, "to be entitled to relief, a trademark holder is not required to adopt the most stringent quality control procedures available" because "[a] trademark holder is entitled, without losing its right to protect what value the mark has, to make a business judgment that additional quality controls would add less value to the mark than their cost." *Id.* at 6-7. The authorities also stress that, to defeat the first sale doctrine, a plaintiff does not have to show that the products sold by the unauthorized seller are of poor quality. Rather, the analysis turns on whether, through its actions, the defendant has ***interfered*** with the defendant's legitimate, substantial, and non-pretextual quality controls. This is because the "harm" in quality control cases "stems not from the actual quality of the goods (which is legally irrelevant) but rather from [the plaintiff's] loss of control over the quality of goods that bear its marks." *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006)*; see also, e.g., Zino Davidoff*, 571 F.3d at 243 ("Where the alleged infringer has interfered with the trademark holder's ability to control quality, the trademark holder's claim is not defeated because of failure to show that the goods sold were defective. That is because the interference with the trademark holder's legitimate steps to control quality unreasonably subjects the trademark holder to the risk of injury to the reputation of its mark."); *Bel Canto*, 837 F. Supp. 2d at 229-30 ("[I]f an unauthorized dealer defends an infringement suit by claiming that it has done no more than stock and resell genuine articles bearing the plaintiff's trademark, so that no possibility of confusion exists, the mark holder can overcome

---

611, 616 (M.D. Fla. 1994) ("Variance in quality control creates a presumption of customer confusion as a matter of law."); *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir. 1991) ("A product is not truly 'genuine' unless it is manufactured and distributed under quality controls established by the manufacturer."). It appears that no case within the Tenth Circuit has previously considered the quality control exception, but, as these citations show, the doctrine has unquestionably been widely accepted and adopted in courts across the country. Defendants also do not dispute its applicability in this case. (Doc. 13 at 5, 9-10.)

that defense by showing that the resale deprives the mark holder of an opportunity to exercise quality control.").[6]

Here, Skullcandy has pleaded substantial facts that satisfy the quality control exception to the first sale doctrine. Defendants' assertions to the contrary simply cannot be resolved on a motion to dismiss as they implicate significant factual disputes. *See Christison v. Biogen Idec, Inc.*, No. 2:11-cv-01140, 2014 U.S. Dist. LEXIS 175050, *22 (D. Utah Dec. 18, 2014) (concluding "a question of fact . . . cannot be resolved on a motion to dismiss").

a.   **Skullcandy Has Sufficiently Pleaded the Applicability of the Quality Control Exception Because: (i) It Has Legitimate, Substantial, and Non-Pretextual Quality Control Procedures; (ii) It Abides by Its Procedures, and (iii) Defendants' Sales of Products Outside Skullcandy's Quality Controls Harm the Value of Its Trademarks**

<u>**First**</u>, Skullcandy has alleged extensive quality controls that it has implemented throughout its authorized channels of distribution, including requiring all Authorized Dealers to: (i) inspect products, (ii) report defects to Skullcandy, (iii) comply with strict storage guidelines, (iv) comply with Skullcandy's investigations into noncompliance with its quality controls, (v) disclose all their sources of Skullcandy products, (vi) assist with product recalls and other consumer safety information efforts, (vii) provide informed customer service before and after the time of sale, (viii) refrain from relabeling, repackaging, or altering products and their contents, and (ix) comply

---

[6] *See also Societe Des Produits Nestle, S.A. v. Case Helvetica, Inc.*, 982 F.2d 633, 643 (1st Cir. 1992). ("Regardless of the offending goods' actual quality, courts have issued Lanham Act injunctions solely because of the trademark owner's inability to *control* the quality of the goods bearing its name."); *El Greco*, 806 F.2d at 395 ("[T]he actual quality of the goods is irrelevant; it is control of quality that a trademark holder is entitled to maintain."); *Desmond*, 921 F. Supp. 2d at 881-83 (denying motion to dismiss, even though plaintiff did not allege what its specific quality controls were or how products sold by unauthorized seller were different from authorized products, because plaintiff alleged that it maintained strict quality controls through its authorized channels and that defendant's unauthorized sales deprived it of ability to exercise quality control).

with strict rules governing any online sales—including rules that Authorized Dealers cannot sell on online marketplaces without written consent from Skullcandy and cannot sell anonymously. *See* Section II(C), *supra*.

**Second**, Skullcandy has alleged that it follows its quality controls and requires all Authorized Dealers to follow its quality controls. (E.g., Doc. 1. at ¶ 47.)

**Third**, Skullcandy has alleged that Defendants' sales of products that are outside of Skullcandy's quality controls will diminish the value of the Skullcandy Trademarks because, *inter alia,* their sales are causing consumers to write negative online reviews of Skullcandy products that blame Skullcandy and cause other consumers to be less likely to purchase Skullcandy products. (*Id.* at ¶¶ 35-41, 43, 46, 125-126.) One of the primary purposes of Skullcandy's quality control program is to prevent the harm to its reputation and goodwill that is caused by the sale of poor quality products and resulting negative reviews from consumers. (*Id.* at ¶ 46.)

Skullcandy's allegations also establish numerous ways that Defendants interfere with Skullcandy's quality controls by anonymously selling products outside of its quality controls, including: (i) preventing Skullcandy from being able to address quality issues in the products Defendants are selling and preventing consumers from being able to bring quality issues in Defendants' products to Skullcandy's attention, because Defendants conceal their identities; (ii) preventing Skullcandy from being able to recall products in Defendants' inventory or that have been sold to Defendants' customers; (iii) preventing Skullcandy from providing other consumer safety information to Defendants' customers; and (iv) preventing Skullcandy from being able to audit Defendants and ensure that Defendants have not obtained counterfeit products or products from another unauthorized source. *See* Section II(E), *supra*.

Further, although Skullcandy is not required to plead anything beyond Defendants' interference with its quality controls, Skullcandy has also pleaded numerous ways in which Defendants are failing to adhere to Skullcandy's quality controls, including: (i) not inspecting products in accordance with Skullcandy's quality controls, removing defective products from their inventory, and reporting defective products to Skullcandy; (ii) not complying with Skullcandy's requirements relating to the storage, handling, packaging, and shipping of products; (iii) selling returned, opened, and repackaged products as "new"; (iv) allowing their inventory to be comingled with other sellers' inventories; (v) not providing qualified, ongoing customer service to customers of Skullcandy products; and (vi) not taking any steps to address negative reviews from their customers who purchased Skullcandy products or cooperating with Skullcandy's investigations of negative reviews. *See* Section II(E), *supra*. As a result of their failure to adhere to Skullcandy's quality controls, Defendants sell products that are of lesser quality than those sold by Authorized Dealers. (Doc. 1 at ¶ 79, 82-83.) Defendants clearly disagree, but that dispute cannot be resolved on a motion to dismiss.

### b.      Defendants' Authorities Are Substantively and Procedurally Inapposite

Defendants cite five decisions where courts held that a plaintiff's quality controls were insufficient to defeat the first sale doctrine, but the facts at issue bear no resemblance to those pleaded here. Moreover—and tellingly—four of the five decisions were issued ***at summary judgment***.

In *Technomarine SA v. Jacob Time, Inc.*, 905 F. Supp. 2d 482, 490-91 (S.D.N.Y. 2012), the court dismissed the plaintiff's complaint because the plaintiff alleged only that its products "undergo a strict quality control procedure," without specifying what the procedures were or why

the defendant's failure to follow them could "impact the value of the [plaintiff's] mark." Neither infirmity applies here. *See* Sections II(C) and (E), *supra*.

*S&L Vitamins, Inc. v. Australian Gold, Inc.*, 521 F. Supp. 2d 188, 203-05 (E.D.N.Y. 2007), *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587, 590-92 (5th Cir. 1993), and *Std. Process, Inc. v. Banks*, 554 F. Supp. 2d 866, 870 (E.D. Wis. 2008) all involved a summary judgment analysis. The courts considered whether there was a genuine issue of material fact when the only "quality control" at issue was that customers who purchased hair care, tanning, and supplement products from the defendants did not receive individualized "consultations" that the plaintiffs required their authorized sellers to provide to customers. In each case, the courts held that this single quality control was insufficient because, when customers purchased from the defendants (through an over-the-counter retail drug store in *Matrix* and on internet websites in *S&L Vitamins* and *Std. Process*), they did not expect to receive professional consultations. As a result, the defendants' actions could not give rise to any consumer confusion. *S&L Vitamins*, 521 F. Supp. 2d at 204-05; *Matrix*, 988 F.2d at 591-92; *Std. Process*, 554 F. Supp. 2d at 870.

Here, in contrast, Skullcandy has pleaded numerous quality controls designed to protect both the Skullcandy brand and consumers, which give rise to a reasonable inference that Defendants' actions create a likelihood of confusion. At a basic level, Defendants' decision to sell anonymously—as well as to sell on a marketplace where all sellers of a product are listed under a single listing—creates consumer confusion because, when customers purchase from Defendants, they do not know Defendants' identity, that Defendants are unauthorized sellers who are not subject to Skullcandy's quality controls, or often even that they could have purchased from other sellers on Amazon offering the same product. Furthermore, consumers are likely to be confused

17

when they purchase from anonymous, unauthorized sellers like Defendants who do not (i) inspect Skullcandy products in accordance with Skullcandy's quality controls, (ii) remove defective products and report them to Skullcandy, (iii) comply with Skullcandy's requirements relating to the storage, handling, packaging, and shipping of products, or (iv) obey Skullcandy's prohibition on selling returned, opened, and repackaged products as "new" and allowing inventory to be comingled with other sellers' inventories—all resulting in the sale of poor quality Skullcandy products that do not meet consumers' expectations. Thus, the reason that the single "individualized consultation" quality control was found lacking *at summary judgment* in *Matrix*, *S&L Vitamins*, and *Std. Process* is absent in this case.[7]

Iberia Foods Corp. v. Romeo, 150 F.3d 298 (3d Cir. 1998) is similarly distinguishable. There, the court reversed a grant of summary judgment for the plaintiff mark owner because the only quality control the plaintiff exercised was an inspection of randomly selected products, and an employee of the plaintiff testified that: (1) no standards governed the inspections, and (2) he could not remember a time in the last 10 years that a product had actually failed an inspection. *Id.* at 305. The court was also troubled by the fact that the plaintiff was not the manufacturer of the product at issue—a household cleaning fluid—and had made no effort to learn the product's

---

[7] *Matrix* is further distinguishable because there was evidence that consumers could purchase the plaintiff's products through authorized channels—salons—with or **without** receiving individualized consultations about products. 988 F.2d at 591-92. Because of this, the court concluded that the plaintiff was itself not exercising its quality controls throughout its authorized channels, which provided a second reason for the court to affirm the grant of summary judgment in favor of the defendant unauthorized seller. *Id.* **Additionally, in *S&L Vitamins* the court noted that even though it found the plaintiff's single quality control to be insufficient at summary judgment, it had previously denied the defendant's motion to dismiss that raised the same arguments because "[o]n a motion for summary judgment . . . the standard is quite different."** 521 F. Supp. 2d 203.

ingredients and other information from the foreign manufacturer that would allow it to conduct a more effective inspection. *Id.* at 305-06. The court concluded that, in the absence of any other quality controls, the "de minimis" inspection was insufficient to overcome the first sale doctrine. *Id.* at 306. Here, again, Skullcandy is the manufacturer of the products bearing its marks and requires Authorized Dealers to comply with far more extensive quality controls than the single inspection at issue in *Iberia Foods*. Finally, the *Iberia* court was only able to initially rule on these issues on summary judgment with the benefit of a detailed factual record—obviously lacking here.

Faced with these legal and procedural realities, Defendants resort to omitting and openly misrepresenting the contents of Skullcandy's complaint. For example, after ignoring Skullcandy's quality controls in their single-page "Statement of Facts" and cherry-picking only a few of Skullcandy's most basic quality controls in their Argument, the Defendants assert that "the quality control procedures which [Skullcandy] alleges are not followed by Defendants have no direct impact on the quality of the Skullcandy products, do not prevent physical differences or latent defects, and are not used in combating counterfeiting." (Doc. 10 at 12.) As Skullcandy's analysis and Statement of Facts show, this is both simply untrue and inappropriate for resolution at the pleading stage.[8]

Defendants' argument that Skullcandy cannot plead facts "upon information and belief" is wrong. The Federal Rules of Civil Procedure do not prohibit pleading facts upon information and

---

[8] Defendants also repeatedly assert that they sell "genuine and authentic" Skullcandy products and suggest that this is an undisputed fact. (*See* Doc. 13 at 2 (stating that "Defendants sell . . . genuine and authentic Skullcandy products" and citing to Plaintiffs' complaint, as if Plaintiffs admit to this statement).) This language is at best pointless (because Skullcandy's allegations must be accepted as true) and at worst an attempt to misrepresent Skullcandy's complaint, as Skullcandy repeatedly alleges that the products Defendants are ***not*** "genuine" Skullcandy products. (E.g., Doc. 1 at ¶¶ 92-94, 108-112, 143-144.)

belief, and it is appropriate under *Twombly*—and necessary—to make such allegations "when the information is particularly within the control of the defendant." *Gracenote, Inc. v. Sorenson Media, Inc.*, No. 2:16-cv-950, 2017 U.S. Dist. LEXIS 73954, at *10-13 (D. Utah May 15, 2017) (collecting cases). It is also appropriate to make such allegations when "the belief is based on factual information that makes the inference of culpability plausible." *Kimray, Inc.    v. Norriseal-Wellmark, Inc.*, 2017 U.S. Dist. LEXIS 69738, at *5 n.3 (W.D. Okla. May 8, 2017) (citing *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).

Each standard is satisfied here. First, until it takes discovery, Skullcandy has no way to know what specific procedures Defendants follow because that information is particularly within their control. What Skullcandy knows for certain is that Defendants are not following Skullcandy's specific quality controls for the simple reason that Defendants have been hiding from and refusing to engage with Skullcandy for the past year. (Doc. 1 at ¶¶ 98-100, 102, 106-08.) There is no case law support for Defendants' argument that Skullcandy should have conducted (and pleaded) "investigations into Defendants' facilities and inventory practices" before it could file its complaint. (Doc. 13 at 15.)[9] Second, it can be reasonably inferred that Defendants are selling poor quality Skullcandy products from the facts that: (1) Defendants have sold a high volume of Skullcandy products, (2) Defendants are non-Authorized Dealers who are outside of Skullcandy's quality controls, and (3) numerous customers who purchased Skullcandy products on Amazon

---

[9] Again, this argument is particularly audacious in light of the fact that, before it sued Defendants, Skullcandy sent letters to Defendants on **five separate occasions**, over a period of nine months, demanding that Defendants cease their sales and explaining the basis for Skullcandy's claims. Defendants could have communicated with Skullcandy at any time during this period, but they did not contact Skullcandy in any way until after it filed suit. (Doc. 1 at ¶¶ 98-100, 102, 106-08.) The suggestion that Skullcandy should have been required to somehow visit and investigate Defendants' facilities, despite their complete silence, is nonsensical.

have written very negative reviews reporting they received products of poor quality. Defendants take issue with the fact that Skullcandy cannot identify which Amazon reviews are specifically about products that Defendants sold, but that information is not yet available to Skullcandy because Amazon does not *allow* product reviews to identify specific sellers. Defendants cannot be allowed to escape the consequences of their actions by choosing to sell poor quality products through an online channel where the resulting negative reviews from customers do real harm to brands' reputations, yet are prohibited from providing information that would allow brands to identify the sellers at fault (at least before taking discovery).

###### 2. Defendants' Products Are Materially Different Because They Are Not Covered by Skullcandy's Warranty

Skullcandy's complaint states that the products Defendants are selling are materially different—and thus, infringing—because they are not covered by the Warranty. As Defendants acknowledge, courts define a material difference as any difference that "consumers would consider relevant to a decision about whether to purchase a product." *Davidoff*, 263 F.3d at 1302; *see also Brilliance Audio, Inc. v. Haights Cross Communs., Inc.*, 474 F.3d 365, 370 (6th Cir. 2007). Courts emphasize that material differences need not be physical, and that the threshold for what constitutes a material difference "must be kept low to include even subtle differences between products" because "it is by subtle differences that consumers are most easily confused." *Nestle,* 982 F.2d at 641; *Beltronics*, 562 F.3d at 1073; *Davidoff*, 263 F.3d at 1302. In applying these standards, courts around the country have held that it is at minimum a question of fact whether products sold by unauthorized sellers are "materially different" from products sold through a manufacturer's authorized channels when they are not covered by the manufacturer's warranty, and that a complaint that alleges a lawful difference in warranty can therefore not be dismissed

under Rule 12(b)(6). *See, e.g., Beltronics*, 562 F.3d at 1073, 1076 (holding that district court properly determined that absence of plaintiff's warranty on products sold by defendant was a material difference and stating that "we are aware of no federal court that has held or observed otherwise when considering the specific question of whether material differences may include warranties and service commitments."); *Tacori Enters. v. Michael Joaillier, Inc.*, 207 F. Supp. 3d 799, 803, 805 (S.D. Ohio 2016) (denying motion to dismiss because of allegation that defendant was selling products not covered by plaintiff's warranty); *TracFone Wireless, Inc. v. Pak China Group Co.*, 843 F. Supp. 2d 1284, 1297 (S.D. Fla. 2012) ("[R]eselling products with inferior warranties also constitutes a material difference."); *Brilliance Audio*, 474 F.3d at 370 (explaining that because "[t]he question of materiality is a fact-based inquiry . . . . an allegation of a material difference cannot properly be dismissed on 12(b)(6) grounds.").

Here, Defendants argue only that Skullcandy cannot rely on its Warranty as a "material difference" because its refusal to extend its Warranty to products sold by Defendants is prohibited by N.Y. Gen. Bus. Law § 369-b ("GBL 369-b"). Notably, Defendants do ***not*** contest that, if this court rejects their argument relating to GBL 369-b, then Skullcandy has stated claims for trademark infringement and unfair competition under the "material difference" exception to the first sale doctrine. Accordingly, Defendant's entire argument rests on whether, at the pleading stage, this Court can hold that GBL 369-b prohibits Skullcandy from declining to extend its Warranty to products sold by Defendants.

Defendants' argument must be rejected for the simple reason that it contradicts the plain language of the statute and also the analysis and conclusions of the **<u>single court</u>** that has considered the statute in the context of the first sale doctrine. Both GBL 369-b and the court in *Bel Canto*

*Design, Ltd. v. MSS HiFi, Inc.* state that the statute does **not** apply as long as a manufacturer does not limit warranty coverage "**solely**" because of a seller's status as a "non-authorized dealer." [10]

In *Bel Canto*, the court initially concluded that because of GBL 369-b, the plaintiff manufacturer could not establish a material difference through the absence of its warranty if the "sole reason" it did not offer its warranty for products sold by the defendant was the defendant's status as an unauthorized seller. 837 F. Supp. 2d at 226-228. However, the court then stressed that:

> [T]he evidence before the Court establishes that [the plaintiff] does not rely *solely* on [the defendant's] unauthorized status for refusing to honor warranties — at least in some instances. **GBL 369-b only bans refusals to honor warranties based *solely* on a dealer unauthorized status. A manufacturer may have other reasons for refusing to honor a warranty, and nothing in GBL 369-b prevents the manufacturer from enforcing such restrictions . . . . For example**, if a dealer is known to the manufacturer to handle the product in a negligent manner, risking damage before the product reaches the consumer, the manufacturer remains free to refuse to honor all warranties from that particular dealer.

*Id.* at 228-229 (emphasis added); *see also* GBL 369-b ("A warranty or guarantee of merchandise may not be limited by a manufacturer doing business in this state solely for the reason that such merchandise is sold by a particular dealer or dealers . . . "). The court held that the plaintiff's warranty exclusion did not violate GBL 369-b because there was evidence that the defendant removed serial numbers from the products it sold and the plaintiff refused to honor its warranties for products with altered serial numbers. *Id.* at 229-31. The court concluded that this was sufficient to show that the plaintiff was not refusing warranty service "solely" because of a seller's

---

[10] In both New York and Utah, courts must interpret statutes by looking first to the plain language of the law and giving words their "ordinary and usually accepted meaning[s]." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 267 P.3d 863, 866 (Utah 2011); *accord Majewski v. Broadalbin-Perth Cent. Sch. Dist.*, 91 N.Y.2d 577, 583 (1998). In this analysis, courts must "give effect to every word of a statute, avoiding [a]ny interpretation which renders parts or words in a statute inoperative or superfluous.'" *Turner v. Staker & Parson Cos.*, 284 P.3d 600, 603 (Utah 2012) (quotation omitted). Defendants ask this Court to read the word "**solely**" out of GBL 369-b.

"unauthorized status," and could thus maintain its material difference. *Id.* at 229-31. The court also noted that the plaintiff's reasons for refusing to extend its warranty to products with altered serial numbers—including "tracking merchandise for regulators and recall, remedying safety-related complaints, [and] quality control"—"make sense." *Id.* at 229.

Defendants have deceptively quoted *Bel Canto* by stating that "N.Y. Gen. Bus. Law § 369-b applies generally to all consumer purchases made via a New York transaction, unless 'a dealer is known to the manufacturer to handle the product in a negligent manner.'" (Doc. 13 at 8 (citing *Bel Canto*, 837 F. Supp. 2d at 229).) But the critical *Bel Canto* language that Defendants omit is "**For example**," which comes immediately before the Defendants' quotation. Thus, contrary to what Defendants want this Court to believe, the application of GBL 369-b is not limited to situations where "a dealer is known to the manufacturer to handle the product in a negligent manner." Rather, *Bel Canto* establishes that negligent handling is but one of many possible reasons why a manufacturer may properly refuse warranty service without violating GBL 369-b. This, obviously, is a material representation of the case and indicative of the fact that GBL 369-b is of no help to Defendants.

Here, Skullcandy clearly **does not** limit its Warranty "solely" because products are "sold by a particular dealer." (Doc. 1 at ¶¶ 67-69.) Instead:

> Skullcandy extends the [Warranty] only to products that were sold by sellers that were subject to Skullcandy's quality controls and agreed to follow its quality controls. Because products sold by unauthorized sellers are not subject to Skullcandy's quality controls and Skullcandy can therefore not ensure the quality of such products, the [Warranty] is not available for Skullcandy products sold by unauthorized sellers.

(*Id.* at ¶ 68.) As Skullcandy has implemented extensive quality controls throughout its authorized channels of distribution, there is a very real difference between products sold by Authorized

Dealers and products sold by unauthorized sellers—much more than their mere authorized "status." Skullcandy does not wish to warrant that all of its products will meet certain conditions—and incur costs through repairs, product replacements, and providing credit—when it knows that anonymous sellers such as Defendants are selling products of poor quality. This is especially true given that Skullcandy has spent significant resources adopting and continuing to exercise quality controls to prevent the sale of poor quality products. Given the realities of e-commerce and the damage being done by rogue unauthorized sellers like Defendants who contravene Skullcandy's quality controls, its warranty limitation "make[s] sense." *Bel Canto*, 837 F. Supp. 2d at 229. [11]

In any event, and particularly important here, a later decision issued by the *Bel Canto* court (not addressed by Defendants) held that whether a manufacturer has "other reasons for refusing to honor any warranty"—which would render § 369-b "immaterial"—is "not an issue we can resolve on a motion to dismiss." 2012 U.S. Dist. LEXIS 86628, at *45-46 (S.D.N.Y. June 20, 2012). Skullcandy has pleaded that it has another reason for refusing to honor its warranty. Thus, under the very case relied upon by Defendants, whether GBL 369-b prohibits Skullcandy from excluding its Warranty from products sold by Defendants cannot be resolved at this stage of the litigation. [12]

## IV.   CONCLUSION

For these reasons, this Court should deny Defendants' motion to dismiss in its entirety.

---

[11] Even if this Court concludes that Skullcandy can evade GBL 369-b only if it declines to extend its Warranty to "a dealer [who] is known . . . to handle the product in a negligent manner"—which it should not hold—Skullcandy nonetheless satisfies that standard as well with respect to Defendants. As discussed, Skullcandy's allegations allow for a reasonable inference that Defendants are handling its products negligently and causing consumers to write numerous negative reviews on Amazon about their receipt of poor quality Skullcandy products.

[12] If this Court finds that Skullcandy has failed to sufficiently plead any of its claims, Skullcandy should be granted leave to amend its complaint. *See Sheldon v. Vermonty*, 269 F.3d 1202, 1207 n.5 (10th Cir. 2001); *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1131 (10th Cir. 1994).

Respectfully submitted,

Dated: March 4, 2019

By: */s/ Monica S. Call*_____
    Monica S. Call

Monica S. Call (#11361)
monica.call@stoel.com
STOEL RIVES LLP
201 South Main Street, Suite 1100
Salt Lake City, UT 84111-4904
Telephone: (801) 328-3131
Facsimile: (801) 578-6999

Daren S. Garcia (*pro hac)*
dsgarcia@vorys.com
Rodney A. Holaday (*pro hac)*
raholaday@vorys.com
William D. Kloss, Jr. (*pro hac)*
wdklossjr@vorys.com
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, OH 43215
Telephone: (614) 464-8356
Facsimile: (614) 719-5112

*Attorneys for Plaintiff*
*Skullcandy, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 4, 2019, a copy of the foregoing was served via CM/ECF on

the following attorneys for Defendants Filter USA, Inc. and Benjamin Friedlander:

> Robert T. Spjute
> Shumway Van LLC
> 8 East Broadway Ste 550
> Salt Lake City, UT 84111
> tee@shumwayvan.com
>
> Steven Stern
> Stern & Schuin LLP
> 595 Stewart Ave Ste 510
> Garden City, NY 11530
> sstern@sternschurin.com
>
> Benjamin James Little
> Stern & Schuin LLP
> 595 Stewart Ave Ste 510
> Garden City, NY 11530
> blittle@sternschurin.com

> */s/ Monica S. Call*
> Monica S. Call