# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **SKULLCANDY, INC.**, a Delaware corporation,<br><br>     **Plaintiff,**<br>vs.<br><br>**FILTER USA, INC.**, a New York corporation, **BENJAMIN FRIEDLANDER**, an individual, both doing business as "Filter Pro" on www.amazon.com, and **JOHN DOES 1-10**,<br><br>     **Defendants.** | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:18-CV-00748-DAK<br><br>Judge Dale A. Kimball |

    This matter is before the court on Defendants Filter USA, Inc and Benjamin Friedlander's Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The court held a hearing on the Motion on June 6, 2019. At the hearing, Defendants were represented by Richard S. Schurin and Robert T. Spjute, and Plaintiff was represented by Daren S. Garcia, William D. Kloss, Jr., and Matthew M. Durham. The court took the matter under advisement. The court considered carefully the memoranda and other materials submitted by the parties, as well as the law and facts relating to the Motion. Now being fully advised, the court issues the following Memorandum Decision and Order denying Defendants' Motion to Dismiss.

## BACKGROUND

### I.   Skullcandy Products

    Plaintiff Skullcandy is a Delaware corporation with its principal place of business in Park City, Utah. Founded in 2003, Skullcandy develops, manufactures, markets, and sells headphones and speakers throughout the United States. Skullcandy sells its products online through its

website as well as through authorized distributors and resellers (collectively, "Authorized Dealers"). With respect to its brand and products, Skullcandy has registered various trademarks with the United States Patent and Trademark Office ("PTO"), which include, but are not limited to: SKULLCANDY® (U.S. Trademark Registration Nos. 3,381,050, 3,726,304, 3,788,707, 3,168,695, 4,396,791, 4,622,094, 4,724,445, 5,166,615, and 5,215,305); CRUSHER® (U.S. Trademark Registration No. 4,573,153); HESH® (U.S. Trademark Registration No. 4,573,154); METHOD® (U.S. Trademark Registration No. 4,800,154); and SMOKIN' BUDS® (U.S. Trademark Registration No. 4,695,063) (collectively, the "Skullcandy Trademarks"). Skullcandy filed the SKULLCANDY® trademark in January 2006, and the PTO registered the mark in November 2006. Skullcandy has actively used the SKULLCANDY® mark since that time.

Skullcandy maintains strict quality controls that apply to both brick and mortar retail settings and online sellers with the three-fold goal of protecting consumers, protecting the value of Skullcandy's brand, and preventing consumers from receiving low-quality products. Not only does Skullcandy abide by these quality controls itself, but it also imposes them on Authorized Dealers. The quality controls require Authorized Dealers to: (1) inspect all products and remove any defective products from their inventory; (2) report any such defects to Skullcandy; (3) store Skullcandy products in accordance with Skullcandy guidelines[1]; (4) disclose their sources of Skullcandy products; (5) assist with product recalls and other consumer safety information efforts; (6) provide ongoing customer support to consumers to ensure the quality and performance of Skullcandy products; (7) refrain from relabeling, repackaging, or altering

---

[1] Skullcandy requires Authorized Dealers to store products in a cool, dry place, away from direct sunlight, extreme heat, and dampness, and in accordance with applicable laws, rules, and regulations and any other storage guidelines specified by Skullcandy.

products and their contents; and (8) comply with Skullcandy's rules governing online sales.  If Skullcandy learns that an Authorized Dealer is failing to adhere to these quality controls when selling Skullcandy products, Skullcandy will conduct an investigation, which can result in that seller losing its Authorized Dealer status.

To further maintain the quality of their products, Skullcandy permits Authorized Dealers to sell Skullcandy products only in specific commercial channels.  Specifically, Authorized Dealers are only permitted to sell Skullcandy products to Authorized Retailers.  Skullcandy defines an "Authorized Retailer" as an individual or business that: (1) Skullcandy has approved as a seller of Skullcandy products; (2) purchases and resells products as part of a commercial enterprise, and is not an End User of Skullcandy products; (3) has agreed to follow Skullcandy's policies; and (4) has not had its Authorized Retailer status revoked by Skullcandy.  Authorized Retailers, in turn, are only permitted to sell Skullcandy products to an "End User," which Skullcandy defines as a purchaser of Skullcandy products who is the ultimate consumer and does not intend to resell the products to a third party.

However, when it comes to internet sales, Authorized Retailers are only permitted to sell Skullcandy products to End Users through Permissible Websites.  According to Skullcandy's policies and rules, Skullcandy requires that, among other things, "Permissible Websites": (1) be operated by an Authorized Retailer in the Retailer's legal name or registered fictious name; (2) state the Retailer's legal name, mailing address, telephone number, and email address (i.e., Authorized Retailers cannot sell products anonymously); (3) not use any third-party fulfillment service to store products or fulfill product orders; and (4) use only images of Skullcandy products that were supplied by or authorized by Skullcandy.  All Authorized Dealers are

prohibited from selling Skullcandy products on any third-party online market place, like amazon.com ("Amazon"), without Skullcandy's prior written consent.

In addition, Skullcandy provides a two-year limited manufacturer's warranty (the "Warranty") for all products sold to End Users by Authorized Retailers. The Warranty provides that if a product contained a manufacturing defect at the time of purchase or had been damaged by improper care before the time of purchase, Skullcandy will repair, replace, or provide a warranty credit for use on Skullcandy's online store. Skullcandy extends the Warranty only to products sold by sellers that were subject to and agreed to follow Skullcandy's quality controls. The Warranty, however, is not available for Skullcandy products sold by unauthorized sellers because such products are not subject to Skullcandy's quality controls, and Skullcandy cannot ensure their quality.

## II. Filter USA's Online Sale of Skullcandy Products

To ensure that Authorized Dealers abide by Skullcandy's quality control requirements and to limit unauthorized sales, Skullcandy regularly monitors its products on the Internet. In January 2018, Skullcandy discovered that products bearing the Skullcandy Trademarks were being sold on Amazon through a storefront called "Filter Pro." After making this discovery, Skullcandy began investigating to discover who was operating the storefront, but Skullcandy was unable to locate any contact information for "Filter Pro." Then, on or about January 24, 2018, counsel for Skullcandy sent a cease and desist letter to the "Filter Pro" storefront via Amazon's messaging system, demanding that the storefront's operators immediately cease selling products bearing the Skullcandy Trademarks. On or about February 16, 2018, counsel for Skullcandy sent another letter to the "Filter Pro" storefront via Amazon's messaging system warning that

Skullcandy would take further action if the storefront did not cease selling products bearing the Skullcandy Trademarks.

In June 2018, counsel for Skullcandy received information through a subpoena that identified the operator of "Filter Pro" as Filter USA, Inc. ("Filter USA"). That information identified an email address and a mailing address, located in Brooklyn, New York (the "Brooklyn Address") for Filter USA.[2] On or about June 12, 2018, counsel for Skullcandy sent another cease and desist letter to Filter USA by email and by mail to the Brooklyn Address. Through further investigation, Skullcandy determined that the Brooklyn Address was an apartment unit where Benjamin Friedlander ("Friedlander") has resided and continues to reside.[3] In addition, Skullcandy discovered that Filter USA was recently sued by a plaintiff trademark owner who filed suit to stop Filter USA's unauthorized sale of its goods.[4] After learning this information, Skullcandy sent another cease and desist letter by email and mail—this time addressed to both Filter USA and Friedlander—that included a draft complaint and indicated that a lawsuit would be filed if Filter USA did not cease its sale of Skullcandy products. On or about September 6, 2018, counsel for Skullcandy sent a fifth cease and desist letter by email and mail to Defendants. However, as of the time of filing the Complaint, neither Filter USA nor Friedlander had ever responded to any of Skullcandy's communications.

### III.     Skullcandy's Complaint

Skullcandy filed the instant suit on September 19, 2018. In its Complaint, Skullcandy raises seven causes of action for: (1) federal trademark infringement; (2) federal unfair

---

[2] Even though the subpoena information identified Filter USA as the operator of the "Filter Pro" storefront, Skullcandy conducted further investigation and determined that Filter USA was its official name and that it was located at the Brooklyn Address.

[3] In their Motion to Dismiss, Defendants claim that Friedlander is an employee of Filter USA. Def.'s Mot. Dismiss at 2.

[4] *Noco Company v. Filter Pro*, No. 1:18-cv-01158-JG (N.D. Ohio). Noco Company, however, voluntarily dismissed the case only a few months after filing it. *See id.* [Dkt. No. 6].

competition; (3) trademark dilution; (4) common law trademark infringement; (5) deceptive trade practices under Utah law; (6) unfair competition under Utah law; and (7) tortious interference with contract. Skullcandy contends that the Skullcandy products sold by Defendants are not authorized. More specifically, Skullcandy claims that the products sold by Defendants are not subject to and do not abide by Skullcandy's strict quality controls. For example, Skullcandy claims that Defendants do not inspect their products; they do no report defective products to Skullcandy; they do not store their products properly; they sell used or returned products as "new"; they commingle their inventory; they do not provide ongoing customer service; and they do not address negative customer reviews. Consequently, Defendants' products are poor quality and do not come with the Warranty. Without the Warranty, Defendants' products are materially different from authentic Skullcandy products and do not constitute genuine Skullcandy products. Skullcandy further claims that Defendants' unauthorized sale of products bearing the Skullcandy Trademarks (1) interferes with Skullcandy's quality controls and its ability to exercise quality control over products bearing the Skullcandy Trademarks; and (2) is likely to cause confusion because it inaccurately suggests that Defendants' products are both subject to Skullcandy's quality controls and come with the Warranty.

Additionally, Skullcandy contends that the SKULLCANDY® trademark has been famous since at least 2016 and is now well known for its association with counterculture, self-expression, and high-quality products. But, due to Defendants' sale of unauthorized, low-quality products, consumers have submitted multiple negative online reviews disparaging Skullcandy's

products and tarnishing the SKULLCANDY® mark.[5] Such disparagement, Skullcandy asserts, has damaged its business, goodwill, and reputation. Finally, Skullcandy argues that Defendants are aware that Skullcandy has entered into agreements with Authorized Dealers that prohibit such dealers from selling Skullcandy products to parties like Defendants who intend to resell the products. As such, Skullcandy claims that Defendants are interfering with the agreements entered into by Skullcandy and its Authorized Dealers.

## DISCUSSION

Defendants move to dismiss each of Skullcandy's seven causes of action for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. When assessing a 12(b)(6) motion, the "court's function . . . is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's . . . complaint alone is legally sufficient to state a claim for which relief may be granted." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1135 (10th Cir. 2014) (quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (quotation marks omitted). "[A]ll well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party." *Acosta v. Jani-King of Oklahoma, Inc.*, 905 F.3d 1156, 1158 (10th Cir. 2018) (quoting *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006)). "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Kansas Penn*

---

[5] Skullcandy lists various reviews that consumers left on Amazon in which consumers claim that they received used, counterfeit, or poor quality Skullcandy products, but, as described below, Skullcandy cannot say for sure whether any of those negative reviews are attributable to Defendants' sales.

7

*Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## I. Dilution, State Law Claims, and Tortious Interference with Contract

As a preliminary matter, Defendants fail to raise any arguments against Skullcandy's Third (dilution), Fifth (deceptive trade practices under Utah Law), Sixth (unfair competition under Utah law), or Seventh (tortious interference with contract) Causes of Action. Instead, Defendants contend that each of Skullcandy's federal claims, which arise under the Lanham Act, are analyzed under the "likelihood of consumer confusion" standard. If Skullcandy has failed to adequately allege that Defendants' sales create a likelihood of confusion, then Defendants argue that the court must dismiss Skullcandy's federal claims. Once the federal claims are dismissed, Defendants aver that the court would no longer have subject matter jurisdiction over the state and common law claims. In other words, Defendants assert that dismissal of the federal claim necessitates dismissal of the state and common law claims.

Defendants' argument, however, misapprehends the relevant legal standard. Unlike Skullcandy's Lanham Act claims for trademark infringement and unfair competition, Skullcandy's dilution claim *does not* require a showing that Defendants' sales create a likelihood of confusion. *See* 15 U.S.C. § 1125(c)(1) (the owner of a famous mark has a trademark dilution claim if the defendant's use "is likely to cause dilution by blurring or . . . tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion"); *see also Interactive Prod. Corp. v. a2z Mobile Office Sols., Inc.*, 326 F.3d 687, 694 n.4 (6th Cir. 2003) (explaining that "a claim for trademark dilution . . . does not require a showing of likelihood of confusion); *Fed. Exp. Corp. v. Fed. Espresso, Inc.*, 201 F.3d 168, 175 (2d Cir. 2000) ("[T]o prevail on a dilution claim a plaintiff is not required to prove likelihood of confusion."); *Chrysler*

*Corp. v. Vanzant*, 124 F.3d 210 (9th Cir. 1997) ("Dilution differs from trademark infringement and unfair competition because it does not require a showing of a likelihood of confusion . . . ."). Thus, on this basis and due to Defendants' failure to raise any other arguments, the court denies Defendants' Motion as to Skullcandy's dilution claim. As a result, the court will maintain supplemental jurisdiction over Skullcandy's state and common law claims. And because Defendants raised no arguments beyond their jurisdictional contention in support of dismissing the state law and tortious interference with contract claims, their Motion must be denied as to those claims as well.

Accordingly, the court denies Defendants' Motion as to Skullcandy's Third, Fifth, Sixth, and Seventh Causes of Action.

## II. Trademark Infringement and Unfair Competition

Defendants also move to dismiss Skullcandy's remaining causes of action for federal and common law trademark infringement and federal unfair competition. To adequately state a claim for trademark infringement under the Lanham Act, plaintiffs must allege that: (1) they own a valid, protectable trademark; (2) the defendant used the trademark in commerce without the plaintiff's consent; and (3) the defendant's use of the trademark creates a likelihood of confusion. *See* 15 U.S.C. § 1114(1)(a); *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008). Because "[t]rademark infringement is a type of unfair competition . . . the two claims have virtually identical elements" and can be "properly addressed together." *Utah Lighthouse*, 527 F.3d at 1050. Further, the elements required to establish a claim for common law trademark infringement mirror those required for trademark infringement and unfair competition under the Lanham Act. *See Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1219 (10th Cir. 2004) ("Among other things, a plaintiff must establish a

protectable interest in its mark, the defendant's use of that mark in commerce, and the likelihood of consumer confusion."). Despite the other required elements, "the central inquiry in a trademark infringement case is the likelihood of consumer confusion." *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1071 (10th Cir. 2009).

When analyzing whether a defendant's use of a trademark creates a likelihood of confusion, courts will typically apply a multi-factored test. *Utah Lighthouse*, 527 F.3d at 1055. But in cases such as this one, where a defendant resells products manufactured by a plaintiff that bear the plaintiff's trademark, courts will analyze the likelihood of confusion element differently because of the common defense known as the first sale doctrine. Under the first sale doctrine, "the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product." *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1240–41 (10th Cir. 2006) (quoting *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir. 1995)). In other words, "a purchaser who does no more than stock, display, and resell a producer's product under the producer's trademark violates no right conferred upon the producer by the Lanham Act." *Id.* at 1241. Thus, it follows that "[t]hose who resell *genuine* trademarked products are . . . not liable for trademark infringement" because "trademark law is designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product, which confusion ordinarily does not exist when a *genuine* article bearing a true mark is sold." *Beltronics*, 562 F.3d at 1071 (emphasis added). However, when a company or individual "sells trademarked goods that are materially different than those sold by the trademark owner," the first sale doctrine is inapplicable, and the seller may be liable for infringement because "[a] materially different product is not genuine and may generate consumer confusion about the source and the

quality of the trademarked product." *Id.* at 1072 (quoting *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1301 (11th Cir. 2001)).

In addition to the so-called "material difference" exception, courts have recognized another exception to the first sale doctrine when a defendant reseller's goods are non-genuine. Under this second exception—the "quality control" exception—unauthorized resellers of trademarked goods may cause consumer confusion and be liable for trademark infringement if they fail to abide by the trademark holder's quality controls when distributing the trademarked goods, *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir. 1996), or if they "interfere[] with the trademark holder's ability to control quality," *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243 (2d Cir. 2009). *See also State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 722 (9th Cir. 2005) ("By depriving [the plaintiff] of the opportunity to monitor and control quality, [the defendant] created the potential for consumer confusion."); *Davidoff*, 263 F.3d at 1300 n.4 (noting that "the lack of quality control can . . . create a likelihood of confusion"); *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 304 (3d Cir. 1998) ("[T]he test is whether the quality control procedures established by the trademark owner are likely to result in differences between the products such that consumer confusion regarding the sponsorship of the products could injure the trademark owner's goodwill."); *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 108 (4th Cir. 1991) (affirming the lower court's decision that because the defendant did not follow the plaintiff's "quality control procedures," the defendant created a likelihood of confusion "as to the quality and source" of the goods).[6]

---

[6] While various other circuits have adopted the quality control exception, it appears that the Tenth Circuit has not yet addressed it.

Therefore, the first sale doctrine provides no protection to a reseller of non-genuine goods that bear a plaintiff's trademark if the plaintiff can establish the material difference exception or the quality control exception. *See Beltronics*, 562 F.3d at 1072 ("[T]he first sale doctrine is not applicable 'when an alleged infringer sells trademarked goods that are materially different than those sold by the trademark owner.'") (quoting *Davidoff*, 263 F.3d at 1301); *Trader Joe's Co. v. Hallatt*, 835 F.3d 960, 970 (9th Cir. 2016) ("The quality control theory of infringement is cognizable under the Lanham Act notwithstanding the first sale doctrine . . . .").

In this case, Defendants assert only that Skullcandy has failed to properly allege the likelihood of confusion element of is trademark and unfair competition claims. Accordingly, for Skullcandy's Complaint to survive, it must have pleaded sufficient facts to support the material difference exception or the quality control exception to the first sale doctrine. If Skullcandy has done so, then it will have adequately alleged that Defendants' goods are non-genuine and likely to cause consumer confusion, and therefore will have stated a plausible claim for relief for trademark infringement and unfair competition. For the following reasons, the court concludes that Skullcandy has adequately alleged both exceptions.

### A. Material Difference Exception

When analyzing the material difference exception, courts must first determine whether the differences between the trademark holder's goods and the unauthorized reseller's goods are material. *See Beltronics*, 562 F.3d at 1072–73. "[A] difference is material if 'consumers [would] consider [it] relevant to a decision about whether to purchase a product.'" *Id.* at 1073 (alterations in original) (quoting *Davidoff*, 263 F.3d at 1302); *see also Brilliance Audio, Inc. v. Haights Cross Commc'ns, Inc.*, 474 F.3d 365, 370 (6th Cir. 2007). However, the material difference need not be physical. *See Beltronics*, 562 F.3d at 1073. Rather, material differences

can include nonphysical characteristics such as "warranties and service commitments." *Id.*; *SKF USA Inc. v. Int'l Trade Comm'n*, 423 F.3d 1307, 1312 (Fed. Cir. 2005) ("[P]hysical material differences are not required to establish trademark infringement . . . because trademarked goods originating from the trademark owner may have nonphysical characteristics associated with them, including services, such that similar goods lacking those associated characteristics may . . . mislead the consumer."); *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 639 (1st Cir. 1992) ("Other sorts of differences—differences in, say, warranty protection or service commitments—may well render products non-identical in the relevant Lanham Trade–Mark Act sense."). It is important to note, though, that "not all differences are material." *Beltronics*, 562 F.3d at 1072. "Some differences between products 'prove so minimal that consumers who purchase the alleged infringer's goods get precisely what they believed they were purchasing [and] consumers' perceptions of the trademarked goods are not likely to be affected by the alleged infringers sales.'" *Id.* at 1072–73 (quoting *Iberia Foods*, 150 F.3d at 303). Nevertheless, the materiality threshold "must be kept low to include even subtle differences between products" because subtle differences are more likely to cause confusion. *Id.* at 1073 (quoting *Davidoff*, 263 F.3d at 1302); *see also Nestle*, 982 F.2d at 641 ("[T]he threshold of materiality must be kept low enough to take account of potentially confusing differences—differences that are not blatant enough to make it obvious to the average consumer that the origin of the product differs from his or her expectations.").

Here, Skullcandy contends that its products are materially different from the products sold by Defendants in that Defendants' products do not come with the Warranty. Specifically, Skullcandy claims that the Warranty (1) only extends to products sold by sellers that were subject to Skullcandy's quality controls and agreed to follow such quality controls; (2) is not

13

available to products sold outside of Skullcandy's quality controls by unauthorized sellers because Skullcandy cannot ensure the quality of such products; (3) is a material element of genuine Skullcandy products; and (4) is an important condition for consumers when considering whether to buy Skullcandy products. Thus, because Defendants are unauthorized sellers that do not abide by Skullcandy's quality controls, Skullcandy claims that the Warranty does not cover Defendants' products. Skullcandy argues that refusing to extend the Warranty makes sense given the significant cost that it would be forced to incur by guaranteeing the quality of products that have passed through uncontrolled, unauthorized channels of commerce. Conversely, Defendants aver that Skullcandy's limitation on extending the Warranty violates New York law. Because Skullcandy's Warranty restriction is unlawful, Defendants assert that the Warranty must cover their products and so cannot serve as a material difference.

Defendants claim that New York General Business Law § 369-b prohibits Skullcandy's Warranty restriction. That statute provides, in relevant part:

> A warranty or guarantee of merchandise may not be limited by a manufacturer doing business in this state *solely* for the reason that such merchandise is sold by a particular dealer or dealers . . . . Any attempt to limit the manufacturers warranty or guarantee for the aforesaid reason is void.

N.Y. Gen. Bus. Law § 369-b (emphasis added). The court, however, finds Defendants' argument unavailing because it is controverted by the statute's plain language. Section 369-b prohibits manufacturers from limiting their warranty "solely" on the basis of ensuring that their products are sold by particular dealers (i.e., authorized dealers). *Id.* In other words, Section 369-b does not apply if a manufacturer limits its warranty based on reasons other than a dealer's status. *Bel Canto Design, Ltd. v. MSS Hifi, Inc.*, 837 F. Supp. 2d 208, 228–29 (S.D.N.Y. 2011) ("GBL 369–b only bans refusals to honor warranties based *solely* on a dealer['s] unauthorized status. A manufacturer may have other reasons for refusing to honor a warranty, and nothing in

14

GBL 369–b prevents the manufacturer from enforcing such restrictions.") (emphasis in original). Here, Skullcandy does not limit its Warranty based "solely" on a dealer's status. Instead, it limits the Warranty based on whether a reseller's products have been subjected to Skullcandy's strict quality controls. Consequently, Defendants cannot rely on section 369-b to refute Skullcandy's material difference argument.

Defendants failed to raise any arguments beyond section 369-b to support its claim that there exists no material difference between their products and Skullcandy's products. Skullcandy has therefore adequately alleged the likelihood of confusion element based on the material difference exception and so has properly stated a claim for trademark infringement and unfair competition. As such, the court denies Defendants' Motion as to Skullcandy's First, Second, and Fourth Causes of Action.

### B. Quality Control Exception

Even if the court concluded that Skullcandy had failed to state a claim under the material difference exception, Skullcandy's Complaint would still survive under the quality control exception. "One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." *Warner-Lambert*, 86 F.3d at 6 (quoting *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986)). Accordingly, to be entitled to relief for trademark infringement against a defendant that is reselling products that bear a plaintiff's trademark, the plaintiff trademark holder must first establish that "(i) it has established legitimate, substantial, and nonpretextual quality control procedures, (ii) it abides by these procedures, and (iii) the non-conforming sales [by the defendant] will diminish the value of the mark." *Id.*; *see also Iberia Foods*, 150 F.3d at 304. Nevertheless, "a trademark holder is not required to adopt the most

stringent quality control procedures available." *Warner-Lambert*, 86 F.3d at 6. Rather, a mark holder is "entitled, without losing its right to protect what value the mark has, to make a business judgment that additional quality control measures would add less value to the mark than their cost." *Id.* at 7.

After establishing the three *Warner-Lambert* factors, a mark holder must have established that the unauthorized reseller either failed to abide by the trademark holder's quality controls, *id.* at 6, or interfered with the trademark holder's ability to implement its quality controls, *Zino*, 571 F.3d at 243. *See also Wellnext LLC v. OVM LLC*, No. 17-CV-62107, 2018 WL 7048129, at *3 (S.D. Fla. Feb. 16, 2018) ("In order to support such a claim at the motion to dismiss stage, the Complaint must allege (1) what Plaintiff's quality control measures are and (2) how the products sold by Defendants fail to meet these quality control measures.") (quotation marks omitted). Importantly, though, the focus of this analysis is not on the physical quality of the reseller's goods, but on the mark holder's ability to maintain quality control over products bearing its mark. *See Am. Petroleum Inst. v. Cooper*, 718 F.3d 347, 359–60 (4th Cir. 2013) ("[T]he Lanham . . . Act affords the trademark holder the right to control the quality of the goods manufactured and sold under its trademark. The actual quality of the goods is irrelevant; it is the control of the quality that a trademark holder is entitled to maintain."); *see also Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006); *Zino Davidoff*, 571 F.3d at 243; *Nestle*, 982 F.2d at 643. This is because the harm in these types of cases "stems not from the actual quality of the goods (which is legally irrelevant) but rather from [the plaintiff's] loss of control over the quality of goods that bear its marks." *Lorillard Tobacco*, 453 F.3d at 382.

In this case, Skullcandy has pleaded enough facts to have properly alleged the quality control exception. First, as shown above, Skullcandy has pleaded what its quality controls are

16

and how such controls are legitimate, substantial, and nonpretextual. Second, Skullcandy has alleged that it abides by its quality controls, and it requires Authorized Dealers to abide by them as well. Third, Skullcandy has alleged that Defendants' sales will diminish the value of the Skullcandy Trademarks because such sales have caused consumers to leave negative online reviews about Skullcandy products, thereby dissuading other consumers from purchasing Skullcandy products.[7] Moreover, Skullcandy has alleged that Defendants' interference with its quality controls will further diminish the value of the Skullcandy Trademarks because it impedes Skullcandy's ability to ensure that all products bearing those marks adhere to its quality standards. Similarly, Skullcandy's allegations establish various ways in which Defendants, as anonymous sellers, are interfering with its quality controls. For example, Defendants' sales prevent Skullcandy from (1) being able to address faulty products sold by Defendants; (2) being able to recall products sold by Defendants; (3) providing consumer safety information to Defendants' customers; and (4) being able to audit Defendants and ensure that they have not obtained counterfeit products or products from another unauthorized source. Lastly, Skullcandy has pleaded various specific ways in which Defendants are not adhering to its quality controls. The court thus concludes that Skullcandy has pleaded facts sufficient to support the quality control exception.

Defendants argue that Skullcandy's allegations fall short because Skullcandy's quality controls do not prevent against physical differences or latent defects in products. But this

---

[7] Skullcandy concedes it cannot link specific negative reviews to the products sold by Defendants. However, it claims that the court can reasonably infer that some of the reviews are a result of Defendants' sales because Defendants have sold a high volume of Skullcandy products, and Defendants are non-Authorized Dealers making sales outside of Skullcandy's quality controls. Skullcandy further claims that it has been unable to specifically attribute any of the negative reviews to Defendants not for any fault of its own, but because it is Amazon's policy to prohibit consumers from identifying specific sellers in product reviews. In light of the circumstances, the court agrees that this is a reasonable inference. Importantly, the question of whether Defendants' sales actually led to any of the negative reviews should easily be resolved during discovery.

17

argument is inapposite given that the "actual quality of the goods is irrelevant." *Am. Petroleum*, 718 F.3d at 359. Next, Defendants argue that Skullcandy failed to plead any allegations regarding its own test-purchases of Defendants' products or conduct any investigations into Defendants' facilities and inventory practices. But these contentions also miss the mark and impose a higher burden of pleading than is required for a 12(b)(6) motion. Indeed, a plaintiff generally would not conduct such an extensive investigation into a defendant's products until after the discovery process had begun. That is especially true where, as here, the defendant has failed to respond to or communicate with the plaintiff after the plaintiff's repeated attempts to do so over a nine-month period. Furthermore, many of Defendants' arguments and Skullcandy's allegations require fact-intensive inquires that would be inappropriate for the court to resolve on motion to dismiss. *See, e.g., Brilliance Audio*, 474 F.3d at 370 (explaining that "a fact-based inquiry requiring an examination of the products and markets at issue . . . cannot properly be dismissed on 12(b)(6) grounds"). Accordingly, the court is unpersuaded by Defendants' arguments and concludes that Skullcandy has independently stated a claim for relief for trademark infringement and unfair competition based on the quality control exception.

As a final matter, Defendants contend that if the court adopts Skullcandy's arguments, then every unauthorized seller of any product on Amazon would be deemed an infringer. The court finds this argument unpersuasive for two reasons. First, it overstates the ramifications of the court denying Defendants' Motion. The court denying Defendants' Motion indicates that Skullcandy has stated a plausible claim for relief; it does not establish that Defendants, let alone all unauthorized Amazon sellers, are undeniably liable for infringement. Second, in *Beltronics*, the Tenth Circuit addressed and rejected a very similar argument. In that case, the defendant claimed that if the nonexistence of warranties and service commitments was sufficient to

establish the material difference exception, then all trademark owners could "eliminate the resale of [their] goods, shut down [their] competitors, and ultimately fix the price of [their] product simply by limiting [their] warranty coverage and service commitments to those who buy from it directly." *Beltronics*, 562 F.3d at 1074. This would then result in "all resellers . . . be[ing] unavoidably and invariably liable under the Lanham Act." *Id.* The court dismissed this argument and explained that "the fact that the resale of a trademarked product that is materially different can constitute a trademark infringement does not mean that it always does." *Id.* (quotations and citations omitted). The Tenth Circuit then explained that only the material differences that create a likelihood of consumer confusion are those that will incur liability. *Id.* Here, the fact that Skullcandy has stated a claim for infringement does not mean that Defendants will ultimately be liable for infringement. As such, Defendants' argument is unavailing.[8]

Because Skullcandy has properly stated a claim for relief for each of its seven causes of action, Defendants' request to dismiss Skullcandy's Complaint must be denied.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is DENIED in its entirety.

Dated this 21st day of June, 2019.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge

---

[8] Defendants make much ado about Skullcandy basing many of its allegations "upon information and belief." Nevertheless, this form of pleading is "not prohibited by the Federal Rules of Civil Procedure, and is appropriate when the information is particularly within the control of the defendant," as is the case here. *Gracenote, Inc. v. Sorenson Media, Inc*, No. 2:16-CV-950 CW, 2017 WL 2116173, at *3 (D. Utah May 15, 2017).